# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**JAMES W. FOWLER CO.**, an Oregon corporation,

          Plaintiff,

    v.

**QBE INSURANCE CORPORATION**, a foreign insurance company,

          Defendant.

Case No. 3:18-cv-1705-SI

**OPINION AND ORDER**

Larry Setchell, SETCHELL NW LEGAL SERVICES PS, PO Box 8470, Spokane, WA 99203; Andrew J. Kinstler and Shawn Q. Butler, HELSELL FETTERMAN LLP, 1001 Fourth Avenue, Suite 4200, Seattle, WA 98154. Of Attorneys for Plaintiff.

Brian R. Talcott and Eric A. Kekel, DUNN CARNEY ALLEN HIGGINS & TONGUE LLP, 851 SW Sixth Avenue, Suite 1500, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

       James W. Fowler Co. ("Fowler") brings this action against its insurer, QBE Insurance Corporation ("QBE"), over QBE's refusal to cover the alleged loss of Fowler's micro-tunnel boring machine ("MTBM"). QBE contends that Fowler's insurance policy does not cover the alleged loss because the MTBM suffered no physical damage, while Fowler contends that the policy does not require physical damage for a loss to be covered.  Both parties have moved for

summary judgment. For the following reasons, Plaintiff's Motion for Partial Summary Judgment (ECF 43) is GRANTED and Defendant's Cross-Motion for Summary Judgment (ECF 48) is DENIED.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632

F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

Fowler is an Oregon corporation based in Dallas, Oregon. Fowler is a diversified general contractor providing heavy civil and tunneling construction solutions for municipalities, agencies, and private owners across America. Fowler has completed varied projects, including water and wastewater treatment facilities; fish hatcheries, fish passage facilities, and marine projects; bridge and highway interchange construction and rehabilitation; sewer, water, and utility pipelines; subdivision infrastructure; pipeline relining; and tunneling, auger boring, pipe ramming, and pipe bursting. QBE is a Pennsylvania insurance company that does business in Oregon and elsewhere.

### A.  The Construction Project

In 2013, Fowler contracted with the North Dakota State Water Commission ("NDSWC") for the Southwest Pipeline Project (the "Project"). The Project called for Fowler to construct an approximately 2,700 lineal foot pipeline under Lake Sakakawea near Beulah, North Dakota. The pipeline is designed to collect lake water through a raw water intake caisson at the bottom of Lake Sakakawea. Lake water is to be piped to the shore and screened, where a water treatment plant operated by the NDSWC will supply potable water for both domestic and livestock use in Southwest North Dakota. Fowler constructed a 151-foot-deep vertical launch shaft on the shore

of Lake Sakakawea. From the launch shaft, Fowler deployed the MTBM to tunnel horizontally

under the lake in order to install the underground water intake pipeline through pipe-jacking.

Fowler began tunneling in 2015. This first tunneling effort failed when the tunnel filled with

sand and water, leading to the loss of that MTBM (a loss disclosed to QBE in 2016). Fowler

redesigned the project, changing the tunnel position, the type of pipe, and other details. Fowler

kept many of the same elements from the first plan, including the use of an MTBM and pipe-

jacking as well as the plan to dig out the MTBM from about ten feet below the lakebed and

remove it from the lake. Fowler resumed construction in 2017. For this resumed construction,

Fowler secured contractors' equipment coverage from QBE to cover the MTBM for a value of

$2,206,947.

**B.  The Alleged Loss**

Fowler relaunched the MTBM from a new location in the existing shaft. By October 5,

2017, Fowler had tunneled about 1,080 feet. On that day, Fowler's employees noticed that in the

middle of the constructed tunnel a section of reinforced concrete jacking pipe was cracked and

deformed. The jacking pipe could no longer be pushed, and the creation of the tunnel could not

advance forward. The pipe section with the most noticeable deformation was pipe section 58.

Pipe 58 and other surrounding pipes were inspected and found to have proper steel reinforcement

within the concrete. Later investigation revealed that the earth above the section of pipe

unexpectedly moved or shifted and point-loaded or wedged the jacking pipe sections in place,

preventing the tunnel from moving. At that time, pipe 109 had been set in place for jacking but

could not progress any further. Because the jacking pipe could no longer be pushed forward, the

MTBM could not progress forward, stranding and immobilizing it some 100 feet below the

surface. The MTBM cannot be recovered according to Fowler's original plans. Fowler contends

that the MTBM will remain permanently where it is now because it cannot move forward and

cannot be removed backward through the tunnel because, by necessity and design, its dimensions are larger than the jacking pipe that pushes it forward. Fowler has considered ways to recover the MTBM and ultimately salvaged portions of the MTBM, which Fowler does not claim as losses here. Fowler, however, has determined that there is no feasible and cost-effective way to recover the remaining portions of the MTBM. Fowler seeks to recover insurance proceeds from QBE on those remaining portions.

## C.  The Policy

Under the Contractors' Equipment Policy (the "Policy") issued by QBE to Fowler, QBE insured Fowler's "Scheduled Equipment," which included the MTBM by endorsement. The Policy covers "direct physical loss caused by a covered peril" to Fowlers' contractors' equipment. The Policy identifies "covered perils" as "risks of direct physical loss unless the loss is limited or caused by a peril that is excluded." The Policy excludes direct and indirect loss or damage covered by certain governmental and related activities (orders of civil authorities, nuclear hazard, and war and military action). The Policy also excludes loss or damage caused by or resulting from other perils (contamination or deterioration, criminal acts, loss of use, mechanical breakdown, missing property, pollutants, temperature/humidity, voluntary parting, and wear and tear). The Policy then sets forth what must be done in the event of a loss, including that property cannot be abandoned to QBE without its written consent.

The Policy also provides how property is valued, how much is paid for a loss, how losses are paid, and other conditions. For covered losses, QBE only pays amounts above the $5,000 deductible. QBE then has several payment options available to it, including to:

1) pay the value of the lost or damaged property;

2) pay the cost of repairing or replacing the lost or damaged property;

3) rebuild, repair, or replace the property with other property of equivalent kind

and quality, to the extent practicable, within a reasonable time; or

4) take all or any part of the property at the agreed or appraised value.

In the event QBE pays for a loss and "lost or damaged property is recovered," the

following additional provisions apply, in relevant part:

> a. "you" must notify "us" promptly if "you" recover property or
> receive payment;

> b. "we" must notify "you" promptly if "we" recover property or
> receive payment;

> c. any recovery expenses incurred by either are reimbursed first;

> d. "you" may keep the recovered property but "you" must refund
> to "us" the amount of the claim paid or any lesser amount to which
> "we" agree[.]

Amended Complaint Exhibit A, ECF 9-1 at 74.

## D.  QBE's Investigation and Denial of Fowler's Insurance Claim

On October 30, 2017, Fowler provided QBE notice of the loss of the MTBM because

Fowler could not "progress" the MTBM and it was stranded. Upon receipt of the claim, a QBE

senior claims manager assigned the claim and observed that the claim "involve[d] a very

expensive tunnel boring machine that may have been lost down the hole [Fowler was] tunneling.

Depending on the coverage there should be coverage for lost drills." QBE began its investigation

by retaining Paul Vaulman to perform, among other things, the following tasks: inspect the

property to document the extent of damage to the MTBM and piping; undertake engineering

analysis of tunneling issues to develop repair options; analyze engineering reports and repair

scope provided by Fowler's consultants or contractors; and prepare an MTBM and piping

damage assessment report.

In September 2018, QBE sent Fowler a letter denying coverage for the MTBM. QBE

asserted that the Policy did not cover the cost to replace the MTBM because: (1) the MTBM was

not covered property because it was used for "mining"; (2) the MTBM did not suffer a direct

physical loss because there was no damage to it; (3) the Policy excluded the claim as a loss due

to an order of a civil authority premised on how the Army Corps might respond to a permit

request; (4) the Policy excluded the claim as a loss due to loss of use premised on Fowler's

inability to use the MTBM; (5) the Policy excluded the claim as a loss due to mechanical or

structural breakdown premised on the collapse of the tunnel and its components; and (6) Fowler

cannot abandon the MTBM to QBE.

## DISCUSSION

The primary legal question before the Court is whether the burial deep underground of

covered property that remains intact and undamaged constitutes a "direct physical loss." If it

does not, summary judgment in favor of QBE is appropriate. If it does, the Court must determine

if an exception to coverage applies and whether there is a genuine issue of material fact for a jury

to decide.

### A.  Oregon Rules of Insurance Policy Construction

The interpretation of an insurance policy is a question of law, and the Court's task is to

ascertain the parties' intentions. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or. 464,

469 (1992). "We determine the intention of the parties based on the terms and conditions of the

insurance policy," *id*., as interpreted from the perspective of the "ordinary purchaser of

insurance." *Totten v. New York Life Ins. Co.*, 298 Or. 765, 771, (1985); *see also Hunters Ridge*

*Condo. Ass'n v. Sherwood Crossing, LLC*, 285 Or. App. 416, 422 (2017) (stating that the terms

of an insurance policy are to be interpreted according to the understanding of an ordinary

purchaser of insurance); *Boly v. Paul Revere Life Ins. Co*., 238 Or. App. 702, 708-09, *rev den*,

350 Or. 130 (2011) (noting that the meaning of a term in an insurance policy that is not defined

in the policy is to be determined based on the understanding of an ordinary purchaser (citing *Botts v. Hartford Acci. & Indem. Co*., 284 Or. 95, 100 (1978))).

If an insurance policy explicitly defines a disputed term, then a court should apply that definition. *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 307-08 (1999). But if the policy does not define the term, a court should review various aids of interpretation, first considering whether the term has a plain meaning, because it "is susceptible to only one plausible interpretation." *Id.* at 308. If the term has a plain meaning, a court should apply that meaning and the analysis is complete. If the term has more than one plausible interpretation, a court should proceed to the second interpretive aid, *id.* at 312, which involves examining the term "in light of 'the particular context in which that term is used in the policy and the broader context of the policy as a whole.'" *Hoffman*, 313 Or. at 470. If an ambiguity remains after that analytical step, then "any reasonable doubt as to the intended meaning of such [a] term[ ] will be resolved against the insurance company." *Shadbolt v. Farmers Ins. Exch.*, 275 Or. 407, 411 (1976). "A term is ambiguous… *only* if two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continue[ ] to be reasonable," despite a court's use of the interpretive aids outlined above. *Hoffman*, 313 Or. at 470 (italics in original).

## B. Covered Property

QBE initially denied coverage for the MTBM on the basis that it was being used for mining. Fowler asked the Court to hold that the MTBM is covered property under the Policy as a matter of law. QBE did not address Fowler's argument on this issue, which the Court construes as a concession that the MTBM is in fact covered property under the Policy.

## C. Direct Physical Loss

The Policy provides insurance for "direct physical loss" to covered property that is not excluded by some other provision of the Policy. The Policy does not define "direct physical

loss." QBE contends that "direct physical loss" requires physical damage. Fowler, however, argues that the common understanding of "direct physical loss" includes tangible property being placed beyond recovery when it is immobilized and stranded, even if the property is not damaged or destroyed.

Fowler first analyzes the words "physical" and "direct." "Direct," when used in relation to a loss, refers to the loss being "proximate" as opposed to "remote," Fowler says. "Physical," Fowler contends, is meant to exclude intangible loss, such as depreciation of value. Finally, Fowler cites the Webster's Dictionary definition of "loss" as "the state or act of being destroyed or placed beyond recovery." Webster's Third New International Dictionary 1338 (2002). Fowler contends that something that suffers a "loss" is not required to be an irretrievable loss, because Webster's provides a usage example contrasting an "irretrievable loss" with simply a "loss." *Id*. at 1196.

Fowler argues that the Policy covers potentially retrievable losses because the Policy contemplated that lost property – for example, stolen property – might later be recovered. Further, the Policy recognized that there can be a loss without damage because the word "loss" refers to both "loss or damage" and property being "lost or damaged:"

> 1. "If more than one coverage of this policy insures the same **loss**, 'we' pay no more than the **actual claim, loss, or damage sustained**."
>
> 2. "In the event of **loss** covered by this coverage form, 'we' have the following options: 1) pay **the value of the lost or damaged property**; 2) pay **the cost of repairing or replacing the lost or damaged property** . . . ."
>
> 3. "If 'we' pay 'you' for **the loss** and **lost or damaged property is recovered**, or payment is made by those responsible for the loss, the following provisions apply: . . . ."

Amended Complaint Exhibit A, ECF 9-1 at 70, 71, 74 (emphasis added).

Fowler also cites a Minnesota state case in which another insurer recognized that the term "physical damage" means "a distinct, demonstrable, and physical alteration," while "physical loss" means "those situations where an external force has rendered the property unsafe or unusable, even though the property remains physically unchanged." *Cedar Bluff Townhome Condo Ass'n, Inc. v. Am. Family Mut. Ins. Co.*, 857 N.W.2d 290, 295 (Minn. 2014). Other portions of the Policy not relevant to this dispute specifically refer to "direct physical damage," which Fowler argues is further evidence that the Policy means something other than damage when it referred to "direct physical loss."

QBE, on the other hand, contends that Oregon federal and state courts have consistently arrived at the conclusion that "direct physical loss" requires physical damage. First, QBE cites *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, 1999 WL 619100 (D. Or. 1999), for the proposition that there must be distinct and demonstrable physical damage to the covered property before there can be a "direct physical loss." In *Columbiaknit*, the insured was a clothing manufacturer whose building had flooded, causing damage to the building and saturating some of the insured's products within the building. The flooding also exposed unsaturated products to higher levels of spore counts that could have developed into mold or mildew. The insurer paid for the saturated products but denied coverage for the products that were merely exposed to high spore counts. The court upheld the insurer's denial. QBE cites language in the opinion that "physical damage need be distinct and demonstrable" before there can be a "direct physical loss." *Id*. at *7. In that case, however, the court was drawing a distinction between physical damage like water saturation and "the mere adherence of molecules to porous surfaces." The alleged loss or damage in *Columbiaknit* was exposure to spores that *could* have later turned into mold, and the court rightly found that this exposure was too speculative and intangible to hold the insurer liable.

The alleged loss here is neither speculative nor intangible. The MTBM is buried underground, and it is either impossible or unreasonably expensive to recover it. QBE cannot rely on the isolated statement in *Columbiaknit*, made in a very different context, as authority for its sweeping proposition that "direct physical loss" requires physical damage in a circumstance such as this.

QBE also cites *Wyoming Sawmills v. Trans. Ins. Co.*, 282 Or. 401 (1978), which considered a policy covering property damage, defined as "physical injury to or destruction of tangible property." There, the Oregon Supreme Court held that "the inclusion of [the word "physical"] negates any possibility that the policy was intended to include "consequential or intangible damage," such as depreciation in value, within the term "property damage." *Id*. at 406. QBE emphasizes the statement in *Wyoming Sawmills* that "in the absence of a showing that any physical damage was caused to the rest of the building by the defective studs and that the labor cost was for the rectification of any such damage, plaintiff cannot recover." *Id*. at 406-07.

*Wyoming Sawmills*, however, dealt with a policy that covered "physical *injury to or destruction of* tangible property," while QBE's policy covered "direct physical loss." This difference need not be further explored, though, because Fowler alleges a "direct physical loss" even under QBE's construction of the term. In its cross-motion for summary judgment, QBE writes that the "inclusion of the word 'physical' within the phrase 'direct physical loss' reflects an intention to exclude[] losses that are intangible…" The Court agrees. But Fowler's alleged loss is hardly intangible. Unlike vague, indeterminate losses like depreciation in value or speculative losses like future mold growth that may result from exposure to spores, Fowler's alleged loss is concrete: the MTBM is buried deep beneath the earth. *See Wyoming Sawmills*, 282 Or. at 406 (giving "depreciation of value" as an example of "consequential or intangible

damage"); *Columbiaknit*, 1999 WL 619100 (holding that exposure to mold spores does not trigger coverage).

Both parties cite *Western Fire Ins. Co. v. First Presbyterian Church*, where the Colorado Supreme Court found a "direct physical loss" in a case in which gasoline accumulated around and under a church building, causing the premises to become "so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous." 165 Colo. 34, 39 (1968). QBE summarizes the holding of the case as: "gasoline and vapors that had infiltrated and contaminated the foundation, halls, and rooms of a church so physically damaged or altered the church as to render it uninhabitable and thus constituted a 'direct physical loss.'" Yet *Western Fire* never uses the word "damage" in the physical sense, nor does it use "alter." QBE has added physical damage or alteration, but the Colorado Supreme Court expressly stated that a "direct physical loss" occurred when the contamination became so severe as to render the church uninhabitable. *See id.* ("[T]here was no direct physical loss sustained on, for example, the first day that gasoline actually seeped onto the insured's premises. To the contrary, no direct physical loss was incurred by the insured until the accumulation of gasoline under and around the church built up to the point that there was such infiltration and contamination of the foundation, walls and rooms of the church building as to render it uninhabitable…").

Finally, QBE points to an insurance treatise that discusses the meaning of "physical loss:"

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

10A Steven Plitt et al., *Couch on Ins.* § 148:46 (3rd ed.) (June 2020 Update). But Fowler's alleged loss is not intangible or incorporeal, nor a mere detrimental economic effect. Fowler

alleges that the MTBM is permanently buried underground. Fowler's alleged loss is much more analogous to the loss in *Western Fire*, where the church structure remained intact and undamaged, but was rendered uninhabitable by gasoline contamination. The MTBM, while intact and undamaged, is rendered useless to Fowler if it is stuck underground.

Thus, "loss" must mean something more than just "damage." A basic canon of construction is that courts should construe a text to give effect to every word and not make any portion of the text superfluous (*verba cum effectu sunt accipienda*), and if "loss" simply meant "damage," there would be no reason for the contract to use the disjunctive "loss **or** damage." *See* Antonin Scalia & Bryan Garner, *Reading Law*, 174-79 (2012) (discussing the "surplusage canon"). Furthermore, the courts that have considered the phrase "direct physical loss" have not interpreted it as requiring physical damage or alteration. Rather, they have interpreted "direct physical loss" as limiting the loss to only tangible, concrete, and measurable losses, rather than including speculative or intangible losses. But even if there were ambiguity on this question, Oregon law requires that the Court interpret an ambiguous term in favor of an insured. It is not the case that "direct physical loss" unambiguously requires physical damage, given the myriad evidence that in fact the opposite is true. For that reason, the Court holds that "direct physical loss" as used in the Policy does not require physical damage.

## D.  Exclusion for Orders of a Civil Authority

Insurers have the burden to prove that a loss is excluded. *See, e.g., Stanford v. Am. Guaranty Life Ins. Co.*, 280 Or. 525, 527 (1977). "The meaning of a policy exclusion is a question of law." *Fred Shearer & Sons, Inc. v. Gemini Ins. Co.*, 237 Or. App. 468, 480 (2010). If an exclusion is ambiguous, it is construed against the insurer. *Id*.

In its motion for partial summary judgment, Fowler asks the Court to find that the provision of the Policy excluding coverage for losses incurred as a result of "orders of a civil

authority" does not apply in these circumstances. QBE does not respond to Fowler's argument.

The Court thus concludes that QBE has waived any argument that the Policy's provision

excluding coverage for "orders of a civil authority" has any application here.

### E.  Loss of Use Exception

QBE also denied coverage on the ground that the Policy expressly excluded loss caused

by or resulting from loss of use. The Policy states in relevant part that:

> "We" do not pay for loss or damage that is caused by or results
> from one or more of the following: . . .
>
> c. Loss Of Use – "We" do not pay for loss caused by or resulting
> from loss of use, delay, or loss of market.

Amended Complaint Exhibit A, ECF 9-1 at 68. Fowler contends that because it seeks to recover

the value of the MTBM rather than damages resulting from delay, lost profits, costs to obtain

replacement equipment, or the like, the "loss of use" exclusion does not apply as a matter of law.

QBE argues that Fowler misinterprets the Policy. First, QBE contends that Fowler's

reading would make the exclusion meaningless because the Policy only provides coverage for

the actual value of the damaged property or the cost of repairing or replacing the damaged

property. But QBE does not provide a plausible alternative interpretation of the "loss of use"

exclusion. In QBE's Response to Fowler's Motion for Partial Summary Judgment, QBE states

that "what [Fowler] seeks here is akin to the economic loss it suffers because it has decided not

to pursue efforts to recover the MTBM." ECF 49 at 5. QBE then cites to 11 pages in its Cross-

Motion that describe the plans Fowler considered to recover the MTBM, but there is no further

explanation—in either QBE's response to Fowler's motion or in QBE's own cross-motion—of

how Fowler's decision not to pursue any of these plans makes Fowler's claimed loss "akin to the

economic loss it suffers" rather than what the claimed loss actually is: the value of the MTBM.

The Court sees no logical basis for QBE's assertion and finds that the "loss of use" exception does not preclude coverage of Fowler's alleged loss.

## F.  Mechanical Breakdown Exclusion

QBE also argues that the mechanical breakdown exclusion applies. That exclusion states:

> d. **Mechanical Breakdown** – "We" do not pay for loss caused by any mechanical, structural, or electrical breakdown or malfunction including a breakdown or malfunction resulting from a structural, mechanical, or reconditioning process. But if a mechanical, structural, or electrical breakdown or malfunction results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

Amended Complaint Exhibit A, ECF 9-1 at 32. QBE asserts that the collapse of the tunnel constitutes "structural breakdown." Fowler, however, reads the "mechanical breakdown" exception to apply only to breakdowns of the *covered property*, i.e., the MTBM. QBE responds that there is no text limiting this exclusion to the breakdown of the MTBM: the Policy excludes "loss caused by *any* mechanical, structural, or electrical breakdown."

In support of its reading, Fowler offers the following passage from a case decided by the Virginia Supreme Court:

> [T]he effect of [the policy's] exclusion of losses caused by structural or mechanical breakdown or failure *is restricted to losses arising from internal or inherent deficiency or defect, rather than from any external cause.* That interpretation is consonant with, rather than repugnant to, the insurance clause. Losses arising from external causes are covered. Losses caused by inherent defect are excluded. There is a sound pragmatic basis for such an interpretation. A contractor may have recourse against the seller or manufacturer of equipment which fails from inherent defect, but his only protection against damage from external causes is ordinarily the purchase of insurance.

*Caldwell v. Transp. Ins. Co.*, 234 Va. 639, 644 (1988) (noting that a broad interpretation would exclude "from coverage almost every imaginable loss which results in failure of the equipment to function") (emphasis added). QBE first attempts to distinguish the pending case from *Caldwell*

by stating that the drilling equipment at issue in *Caldwell* was damaged, whereas the MTBM has not suffered any damage but rather is trapped underground. Although this is true, it does not negate the court's logic in *Caldwell*.

Second, QBE argues that the alleged loss to the MTBM *is* internal – to the structure that Fowler was building. But the covered property in this case is the MTBM, not the tunnel. In QBE's telling, the collapse of the tunnel was a deficiency or defect *internal* to the MTBM. This novel definition of "internal" is backwards. The collapse of the tunnel is an "external cause" of Fowler's alleged loss of the MTBM.

QBE also summarizes *Nat'l Investors Fire v. Preddy*, 248 Ark. 320 (1970), as holding that, for there to be a mechanical breakdown, there must be a failure in a machine's working mechanisms. QBE implies that *Preddy* is inapplicable to the pending case but gives no explanation for why. In fact, *Preddy* supports Fowler's position for the same reason as *Caldwell*: if the application of the mechanical breakdown exclusion turns on whether there is a defect in the covered property's working mechanisms, the exclusion cannot be understood to apply where the "breakdown" has nothing to do with the covered property. In any event, it is undisputed that there is nothing wrong with the MTBM's working mechanisms.

QBE does not meet its burden of showing that the exclusion applies to these facts. QBE attempts to distinguish several of the cases Fowler cites as authority but provides no authority for its own contention that the breakdown exclusion is meant to exclude losses caused by breakdowns that are *external* to the covered property. QBE contends only that the breakdown exclusion applies to the tunnel collapse here. Although the exclusion does say that it applies to *any* mechanical, structural, or electrical breakdown, the exclusion must be read in the context of the Policy and interpreted according to the understanding of an ordinary purchaser of insurance.

The Court is persuaded by the logic of *Caldwell* that, unless explicitly defined otherwise, a breakdown exclusion refers to internal or inherent defects or deficiencies in the covered property, not to the breakdown of something else, such as the tunnel in this case.

**G. Abandonment Provision**

QBE also denied coverage based on the Policy's abandonment provision. The Policy states that after a loss, an insured must: (1) give prompt notice; (2) protect the property from further damage; (3) send a proof of loss if QBE asks for one; (4) submit to an examination upon request; (5) produce records; (6) exhibit damaged and undamaged property; (7) not make voluntary payments; (8) *not abandon the property to QBE without consent*; and (9) cooperate. Amended Complaint, Exhibit A, ECF 9-1 at 69 (emphasis added). The Policy does not define "abandon" or "abandonment." The provision is listed under a section titled, "What Must Be Done in Case of Loss." The provision is not listed in the exclusions section of the Policy or the conditions section. It also exists in the context of other provisions of the Policy, namely, the loss payment section that allows QBE to "pay the value of the lost or damaged property," pay the cost of repairing or replacing the lost or damaged property," "rebuild, repair, or replace the property," or "*take all or any part of the property at the agreed and appraised value*." Amended Complaint Exhibit A, ECF 9-1 at 71-72 (emphasis added).

QBE contends that abandonment provisions here exist to prevent insureds from "giving up" on attempts to recover or repair covered property by forcing the insurer to take title to the damaged or lost property. QBE argues that the abandonment provision must be read in connection with the Policy's "Valuation" section, which states that replacement cost payments "will not exceed the amount [Plaintiff] spend[s] to repair or replace the damaged or destroyed property" and that replacement cost valuation does not apply until the property is actually repaired or replaced. QBE argues that the valuation provisions and the abandonment provision in

tandem place the burden on the insured to try to repair or replace the item and prohibits the insured from simply treating the situation as a constructive total loss without first establishing that repair or recovery is not feasible. The valuation provision seeks to prevent the insured from getting a windfall payment in excess of the cost of repair or replacement. It also regulates the timing of the payment to the insured. It is not clear how these provisions give rise to QBE's interpretation of the abandonment provision, which creates an obligation that the insured establish the impossibility of recovery before claiming a loss.

Fowler argues that the placement of the abandonment provision in the section "What Must Be Done in Case of Loss" means that the provision only applies when there has been a covered loss, and thus the provision can only naturally be read as simply regulating the insured's ability to pass title of the covered property to the insurer. The Court agrees. If the issue of abandonment determined whether there was a covered loss, the insurer should have listed it under the exclusions section. QBE easily could have added an exclusion that read, "If Fowler chooses not to recover or repair the covered property but instead claims a total loss without QBE's consent, the loss is excluded from coverage." QBE did not do so, and it cannot benefit from any ambiguity in the Policy on this issue.

**H.  No Genuine Dispute of Material Fact**

The Court has determined that Fowler has alleged a "direct physical loss" as a matter of law and that none of the exclusions apply. QBE, however, argues that there remains a genuine issue of material fact as to the recoverability of the MTBM.

As a preliminary matter, Fowler objects to several pieces of evidence that QBE submitted to the Court, contending that they are inadmissible hearsay. After Fowler raised this objection, QBE filed a sur-reply with declarations from Paul Vaulman, Todd Kilduff, and Christopher Dore. These declaration verify that the copies of their respective expert reports submitted to the

Court are true copies of their respective expert reports, as previously described in Brian Talcott's Declaration. Additionally, QBE submitted a declaration from Gregory Straiger that authenticates the documents submitted with his May 29, 2020 declaration as QBE's business records maintained in the ordinary course of business. The Court overrules Fowler's objections based on the evidence submitted with QBE's sur-reply.

On the merits, QBE argues that a jury must resolve the factual matter of whether the MTBM is recoverable. In support, QBE offers the expert report of Todd Kilduff of Kilduff Underground Engineering, Inc. Mr. Kilduff's expert report provides a detailed recovery plan that he contends is technologically feasible.[1] In response, Fowler argues that the possibility that the MTBM could be recovered is not material to this lawsuit. Fowler states that the Policy does not require that it show that there is no possible way to recover the MTBM. Instead, the Policy sets out a process for handling claimed losses that turn out to be recoverable. In Fowler's view, the potential recoverability of the MTBM should not preclude coverage, but if the MTBM later turns out to be recoverable, QBE may, pursuant to the Policy, demand that Fowler reimburse any insurance payout. The relevant portion of the Policy provides:

> **Recoveries** -- If 'we' pay 'you' for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:
>
> a. "you" must notify "us" promptly if "you" recover property or receive payment;
>
> b. "we" must notify "you" promptly if "we" recover property or receive payment;

---

[1] The Court notes that Mr. Kilduff estimated that the cost to recover the MTBM to be approximately $958,000, not including any mark-up for overhead or profit. Talcott Dec., Ex. 6, ECF 50-6 at 1. The MTBM was insured for $2.2 million, but Fowler only seeks to recover the value of the unrecovered portions of the MTBM, which it calculates at $1,884,520.

PAGE 19 – OPINION AND ORDER

      c. any recovery expenses incurred by either are reimbursed first;

      d. "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid or any lesser amount to which "we" agree; and

      e. if the claim paid is less than the agreed loss due to a deductible or other limiting 'terms' of this policy, any recovery will be pro rated between 'you' and 'us' based on 'our' respective interest in the loss.

Amended Complaint Exhibit A, ECF 9-1 at 74.

      The inclusion of this "Recoveries" section in the Policy shows that the parties contemplated coverage of losses that later turned out not to be lost after all. The Policy does not define "loss" or "lost" and creates no requirement that the claimed loss be "irretrievably" lost. QBE's view that an insured must prove that a piece of covered property is irretrievable is impermissibly broad because it would serve to deny coverage if there were a possibility that a loss could be recovered (or if the insured could not conclusively establish that recovery was impossible). The Policy's procedure for reimbursement of payouts suffices to ensure that Fowler is not "gaming the system," as QBE asserts.

      Fowler's motion for partial summary judgment only asks the Court to find that, as a matter of law, the burial of the MTBM deep beneath the surface constitutes a "direct physical loss" under the Policy that is not subject to any exclusion. There is no genuine issue of material fact on these issues. Whether Mr. Kilduff or anyone else can manage to recover the MTBM is a separate issue not before the Court in this lawsuit. If QBE is correct that the MTBM is recoverable, it has an adequate remedy under the Policy to demand the return of all or some of its payout to Fowler.

**CONCLUSION**

Fowler has adequately alleged a "direct physical loss" and no exclusion to coverage applies in these circumstances. QBE's Cross-Motion for Summary Judgment (ECF 48) is DENIED. Because the potential future recovery of the MTBM has no bearing on whether there is a "direct physical loss," there is no genuine issue of material fact for a jury to decide regarding the issue of coverage. Fowler's Motion for Partial Summary Judgment (ECF 43) is GRANTED. Within two weeks from the date of the Opinion and Order, the parties shall confer and file with the Court a joint status report, including a proposed schedule for completing this lawsuit.

**IT IS SO ORDERED**.

DATED this 24th day of July, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge